**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KATRINA PRIOR**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 24-2980-KSM** |
| **INTEGRICHAIN, INC.**, | |
| Defendant. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                        **February 27, 2026**

Plaintiff Katrina Prior brings this action against her former employer, IntegriChain, Inc.

("IntegriChain").  She alleges that IntegriChain wrongfully terminated her employment and

discriminated and retaliated against her because of her pregnancy in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), the Family and Medical Leave Act ("FMLA"), the

Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance

("PFPO").  (Doc. No. 1 ¶¶ 75–110.)  Before the Court is IntegriChain's motion for summary

judgment (Doc. No. 23.)  For the reasons below, the motion is granted.

## I.    BACKGROUND

Viewing the evidence in the light most favorable to Prior, the relevant facts are as

follows.

### A.    Factual Background

IntegriChain provides various professional services to "support pharmaceutical

manufacturers in data services, data analytics, managed services and consulting."  (Doc. No. 28

¶ 1.)  In 2017, it hired Prior as a "Senior Business Analyst in Customer Operations."  (*Id.* ¶ 8.)

About a year later, she was promoted to "Business Analyst Manager." (*Id.* ¶ 9.) Later that year, she went on a nearly three-month maternity leave of absence. (*Id.* ¶ 10.) She testified that she was neither prohibited nor discouraged from taking leave, and indeed, she requested and received the full extent of leave permitted by IntegriChain's policies. (*Id.* ¶ 11.)

About a year after she returned from leave, in mid-2020, IntegriChain promoted her again, this time to "Senior Manager of Customer Success." (*Id.* ¶ 12.) In this role, her job duties "included serving as a relationship manager with customers, hiring and building out the team, and managing the customer support help desk function," (*id.* ¶ 13), but did not include revenue-generating responsibilities, (*id.* ¶ 15). The next year, in 2021, Prior was again promoted, this time to "Director, Customer Engagement." (*Id.* ¶ 14.)

"[A]t various times during her employment," Prior's immediate supervisor was "Jay Kinzer, Executive Director of Data Operations." (*Id.* ¶ 16.) Around September 2021, Prior told "Kinzer that she was pregnant with her second child." (*Id.* ¶ 17.) Before taking her second period of leave, Prior discussed transitioning to a different position, a change which she welcomed, with Brian Coleman who supervised "IntegriChain's Data Unification initiative . . . and [the] Patient and Channel products." (*Id.* ¶¶ 26–27.) The Data Unification initiative was a non-revenue-generating product and was not marketed to customers. (*Id.* ¶ 54.)

Prior took her second maternity leave from October 2021 through February 18, 2022, with intermittent and discrete periods of work. (*Id.* ¶ 24.)[1] While on maternity leave, Prior contacted Coleman about the role on the Data Unification team to express her continued interest

---

[1] Through a combination of sick leave and maternity leave, Prior received the same total amount of time off for her second pregnancy as she did for her first. (Doc. No. 28 ¶ 22.) And Prior later testified that the time she received for her first two pregnancies did not evidence any discrimination. (*Id.* ¶ 23.)

in the job.[2]  (*Id.* ¶ 31.)  And in December 2021, she was offered and accepted "a promotion and corresponding raise to Senior Manager, Product Management" on the Data Unification team. (Doc. No. 28 ¶¶ 35, 38, 40; Doc. No. 1 ¶¶ 25–27.)  Although the mission of the Data Unification project was "to unify a large amount of complex data across IntegriChain's platforms" (Doc. No. 28 ¶ 28), it is undisputed that Prior is not a data scientist or computer engineer (*id.* ¶ 68).  Prior testified that she did not believe that her promotion to this position was discriminatory.  (*Id.* ¶¶ 47–48.)  And she also conceded that Coleman never evidenced any discrimination against her. (*Id.* ¶¶ 47–48.)

On February 18, 2022, Prior returned from leave and assumed her new role.  But by June 2022, Coleman had left IntegriChain, (*id.* ¶ 59), and the company had begun deprioritizing Data Unification in favor of its "Contracts & Pricing and Patient initiatives,"[3] (*id.* ¶¶ 55, 57).  After Coleman's departure, Prior reported to Bradley Burget, Chief Technology Officer.  (Doc. No. 1 at 180:16–181:5, 200:24-201; Doc. No. 2 at 32:13–20.)  In the summer of 2022, IntegriChain moved Prior from the Data Unification initiative to the Patient product line.  (*Id.* ¶ 61.)

Nine employees worked on the Patient product (*id.* ¶ 110), four of whom were based in the United States, five of whom were based in Colombia or India (*id.* ¶ 111).  Seven of the nine employees were "engineers or data scientists."  (*Id.* ¶ 112).  Two of the nine—Prior and Piyush Kankariya—were not "engineers or data scientists," instead, they worked in "Product Management."  (*Id.* ¶ 113.)  At that time, Prior's title was "Senior Manager, Product Management" and Kankariya was a "Product Analyst," (Doc. No. 28 ¶ 114.), which was a more

---

[2] Prior was interested in the new role as she felt "burned out" in her "prior customer engagement role."  (Doc. No. 25-1 at 284:17–285:10.)  This customer engagement role required her to engage directly with customers rather than "directing a department."  (*Id.* at 285:8.)

[3] Prior did not believe IntegriChain moved her or deprioritized the Data Unification program because she was a woman or because she had been pregnant.  (*Id.* ¶ 63.)

junior position, (Doc. No. 27-12 at 77:14–16.)  Kankariya reported to Prior.  (*Id.* at 220:4.)  Prior

earned an "annual salary of $135,000 with a 20% bonus target."  (Doc. 28 ¶ 92.)  Kankariya

earned "$20,268 annually with a 5% bonus target."  (*Id.*)

In November 2022, Jay Kinzer became "Product Line Manager, Data Solutions," and

Prior's direct supervisor.  (*Id.* ¶¶ 86, 87.)  Around this time, the company also began "placing an

increasing emphasis" on a different line of the business, called, Contracts & Pricing," and to this

end, started "moving even engineering over to it."  (*Id.* ¶ 95.)  "There was diminishing customer

interest in the Patient product."  (*Id.* ¶ 101.)  And the "financial outlook [w]as not great."  (*Id.*

¶ 104.)  So, IntegriChain looked to reduce costs.  (*Id.* ¶¶ 106–08.)  It identified personnel

changes and reduced headcount as methods to achieve cost reductions.  (*Id.* ¶ 108.)

In December 2022, Prior's name appeared on an "Impact Sheet" listing positions that

could be eliminated to reduce costs in the Patient product line and across the company.  (*Id.*

¶ 117; Doc. No. 25-32; Doc. No. 26 at 3.)  The next day, her name again appeared on an updated

Impact Sheet confirming that her position was being eliminated and she was apparently slated for

termination.  (Doc. No. 25-33.)  The reasons given were:  "Cost Savings/Budget Adjustment"

and "project work elimination."[4]  (*Id.*)  According to this Impact Sheet, Prior was projected to

receive seven weeks of severance totaling more than $18,000.  (*Id.*)

On January 4, 2023, Kozhushchenko wrote to Lelah Alt, Vice President of Human

Resources, (Doc. No. 28 ¶ 118), explaining that it was Integrichain's plan to "[s]till move Katrina

---

[4] Vickie Kozhuschenko, Chief Human Resources Officer, (Doc. No. 3 at 9:22–23), testified that
the decision to terminate Prior was "final" as of December 2022 and that Prior would be terminated by
default unless IntegriChain could find her an appropriate alternative role, (Doc. No. 27-5 at 65:10–15.)
Kozhuschenko explained that "[w]hat can happen but rarely does happen is that a decision could be
changed [regarding a final termination decision] because of external circumstances."  (Doc. No. 27-5 at
62:12–17.)  Yet, Prior contends that the decision to terminate her was not final until some time in January
2023, after she disclosed her pregnancy.

out on 1/12.  But Brad [Burget] needs to crunch some numbers tonight and will have a final answer tomorrow morning."  (Doc. No. 25-36 at 4.)  Two days later, Kozhuschenko confirmed with Alt that "the plan will still be to notify Katrina on Thursday[, January 12, 2026]."  (Doc. No. 25-37 at 4.)

On January 9, 2023, however, messages between the two women reflected a change in plans to "move Katrina out on 1/12."  (Doc. No. 25-36 at 4.)  Kozhuschenko wrote:

> Katrina [Prior] - set for this Thurs 1/12; Brad [Burget] is talking to Jay [Kinzer] today about notification and team comms.  Can you connect with Brad a bit later?  I told him we'll be ready but he needs to work out who is delivering the message and what other people need to be made aware
>
> . . . .
>
> Just talked to Brad.  His conversation with Jay resulted in a bigger list of things that it would be problematic if Katrina left this Thursday.  AND, apparently Jon Brier[5] may have something on his team for her. *So we're back to a 1/24 date for her, with a potential that it might not happen at all* . . . .  BTW, I did say to Brad that I might suggest we offer Katrina two options, if there really is a place for her to go - 1) move to another part of the org (yes, we know, for the 143rd time!) or 2) take an exit package.

(Doc. No. 25-38) (emphasis added).  The next day, Burget and Kinzer were scheduled to discuss "Katrina['s] exit" in a one-on-one meeting.  (Doc. No. 25-39.)

Consistent with Kozhuschenko's message, Prior was not terminated on January 12, 2023.  Instead, that day, Prior disclosed to Kinzer that she was pregnant with her third child.[6]  (*Id.* ¶

---

[5] Jon Brier was a "Product Line Manager[] overseeing the [Contract and Pricing] business."  (Doc No. 28 ¶ 139.)  Beyond this January 9, 2023 conversation between Burget and Brier, Brier testified to having more than one conversation about Prior joining his team, but he could not recall when those other conversations took place.  (Doc. No. 27-4 at 22:15–19.)

[6] Prior testified she first learned she was pregnant on October 31, 2022, but did not notify anyone at IntegriChain that she was pregnant until January 12, 2023.  She also testified that Kinzer said nothing discriminatory or retaliatory after she disclosed her pregnancy.  (*Id.* ¶ 178.)  Indeed, Prior has not identified any affirmative discriminatory or retaliatory comments by any IntegriChain personnel relating to her third pregnancy.  (*Id.* ¶¶ 190, 194.)

173.)  Burget also learned of her pregnancy "on or shortly after January 12, 2023."  (Doc. No. 26 at 8.)

As of January 20, 2023, IntegriChain continued to investigate whether it had any appropriate alternative positions for Prior.  (Doc. No. 27-10.)  That day, Burget sent a list of employees whose roles were slated for elimination, which included Prior's name, job location, and job category, to Aseem Chandawarkar to determine whether Chandawarkar had interest in placing any of those persons on his team.  Chandawarkar responded that he "ha[d] a definite interest in . . . Piyush Kankariya [who reported to Prior] . . . Dante Arnone . . . and Sam Powery." (Id.)  But Chandawarkar did not identify Prior as a person of interest.  (Id.)

Chandawarkar and Brier both declined to hire Prior for their teams.  Brier explained that he considered Prior, but determined, after discussions with Burget and Kinzer, that she "probably did not have the level of domain expertise that [h]e w[as] looking for."  (Doc. No. 27-4 at 23:3–4, 37:14–16.)  In particular, Brier was seeking

> someone who understood how to not only gather requirements, but understood the chargeback process from a pharmaceutical perspective to be able to discuss with our customers and understand when requirements were industry norms versus things that were specific to them.  Someone who could really understand exactly when we talk about 340B processing, what that meant and different terminologies like 845s, 849s, 844s and exactly, understand . . . without a lot of direction what exactly was being meant and conveyed by that, just those terms.

(Doc. No. 27-4 at 37:22–38:11.)  Brier had previously interacted with Prior at quarterly meetings and was familiar with her.  (Doc. No. 27-4 at 21:14–17.)  But he did not believe that Prior's experience working on the data unification project "would . . . have provided Miss Prior with the necessary domain expertise" he was looking for because "[t]hat role really talked about, more about what the data was, not how the data came into our system and was processed."  (Id. at

39:10–19.)  Indeed, it is undisputed that "Prior had no experience with government pricing calculations."[7]  (Doc. No. 28 ¶ 163.)  However, Brier admitted that he had not reviewed Prior's resume "at any point in connection with any open position [he] had on [his] team," nor did he have a direct conversation with her about a role on his team.  (Doc. No. 27-4 at 21:9-13, 22:5-14.)  Brier decided to hire a male employee who had been "filling a similar role at a competitor [of IntegriChain] beforehand."  (Doc. No. 27-4 at 36:22, 40:12–14).  He testified that in rendering his decision, he had no knowledge that Prior was pregnant.  (*Id.* at 23:20–24:5.)

Chandawarkar similarly was looking for someone with "contracts and pricing experience."  (Doc. No. 25-2 at 195:21–24.)  He did not hire Prior opting, instead, to hire a woman (Doc. No. 27-4 at 29:16–30:6), from an IntegriChain competitor, (Doc. No. 25-44), with whom Chandawarkar had previously worked, (Doc. No. 25-2 at 177:19–23).  Later, that female employee requested and was granted maternity leave.  (*Id.* at 178:6–8.)  There is no evidence that Chandawarkar was aware of Prior's pregnancy when he decided not to select Prior for his team.  (Doc. No. 25-2 at 197:10–15.)  By that same token, there is no evidence that Chandawarkar was unaware of her pregnancy.  (*See* Doc. No. 27-11 at 197:10–23) (Burget failing to recall whether he told Chandawarkar about Prior's pregnancy or whether Chandawarkar was aware of her pregnancy).)  In addition to this outside female hire, Chandawarkar also hired Prior's former direct report, India-based Product Analyst, Piyush Kankariya.  (Doc. No. 27-4 at 33:8-9.)  There is no evidence that Chandawarkar reviewed Prior's or Kankariya's resume or contacted either before making his hiring decisions.  Plaintiff never deposed Chandawarkar.

---

[7] However, Prior did have some experience with "pharmaceutical managed care data," (Doc. No. 28 ¶ 164), and was a recognized hard worker having "demonstrated a-typical agility, flexibility and adaptability" while at IntegriChain, (Doc. No. 26 at 5).

On January 31, 2023, Prior's name appeared on another updated Impact Sheet that included a "potential notification" of separation and "potential/requested separation date" of that same day.  (Doc. No. 25-34.)  Burget and Alt met with Prior that day to inform her that her employment would terminate on February 1, 2023.  (Doc. No. 28 ¶ 178.)  Consistent with the information memorialized in the previous two Impact Lists, Prior was granted over $18,000 in severance and a bonus of over $9,000 that she "would have been eligible for."  (Doc. No. 25-47 at 1.)

Ultimately, Prior was the only employee on the Patient team who was terminated rather than placed in an alternate position.  (Doc. No. 25-3 at 140:22–141:02.)  That is, all seven "engineers and data scientists," previously on the Patient team, were moved to other positions in IntegriChain, (Doc. No. 28 ¶ 112), and Prior's former direct report, Product Analyst Kankariya, was moved to the Contracts and Pricing ("C&P") team and provided a salary of approximately $25,000 or $26,000 per year, (Doc. No. 27-4 at 41:3–6.  Prior's position was eliminated, and her role was not backfilled.  (Doc. No. 27-12 at 309:22–310:2.)[8]

### B.  Procedural History

On February 14, 2024, Prior filed a complaint of discrimination and retaliation with the Pennsylvania Human Relations Commission, which was cross-filed with the Equal Employment Opportunity Commission ("EEOC").  (Doc. No. 1 ¶ 12.)  The EEOC issued a notice of dismissal and right to sue letter to Prior on July 9, 2024.  Prior then brought this suit.  (Doc. No. 1.)  She claims that IntegriChain:  (1) engaged in discrimination in violation of Title VII (Count I);

---

[8] Immediately after Prior's termination, Kinzer and a product manager from another product line assumed Prior's previous duties with periodic assistance from other staff.  (Doc. No. 29 ¶ 79.)  And approximately two years after Prior's termination, and following IntegriChain's acquisition of another company, a male employee from that acquired company was placed into the Patient product chain as a product manager.  (Doc. No. 28 ¶ 185.)

(2) retaliated against her for exercising her rights under the FMLA or otherwise interfered with her invocation of those rights (Count II); (3) engaged in discrimination in violation of the PHRA (Count III); and (4) retaliated against her for exercising her rights under the PFPO (Count IV). (Doc. No. 6.)  After discovery, IntegriChain filed a motion for summary judgment, (Doc. No. 23), which Prior opposes, (Doc. No. 26).  On January 28, 2026, the Court held oral argument on the motion.  (Doc. No. 34.)  The motion is ripe for disposition.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences from the underlying facts in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477

U.S. at 323 (internal quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

After the moving party has met its burden, the non-moving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (internal quotations omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)). That is, the non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). "[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal quotations omitted).

## III.    ANALYSIS

The Court considers Plaintiff's pregnancy discrimination claims under Title VII, the PHRA, and PFPO, before turning to Plaintiff's FMLA claim.

### A.    Title VII, PHRA, and PFPO Discrimination

Title VII[9] prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions or

---

[9] Title VII, the PHRA, and the PFPO have been interpreted similarly. *See, e.g., Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir.1996) (the PHRA is applied in a similar manner as Title VII); *see*

privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).

Discrimination because of sex includes discrimination "because of or on the basis of pregnancy,

childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).

As here, in the absence of direct evidence of discrimination (Doc. No. 30 at 9), the

*McDonnell Douglas* burden-shifting framework applies.  *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802–03 (1973).  The *McDonnell Douglas* framework consists of three steps:  (1) a

plaintiff must establish a prima facie case of discrimination; (2) if she does, the employer must

give a legitimate reason for its conduct; and (3) if the employer meets its burden, the plaintiff

must show the employer's proffered reason is pretextual.  *Anderson v. Wachovia Mortg. Corp.*,

621 F.3d 261, 270–71 (3d Cir. 2010).  Plaintiff argues that she has put forth evidence to show

that her termination was the result of unlawful pregnancy discrimination under this framework.

Defendant disagrees, arguing that the undisputed evidence shows that the decision to terminate

Plaintiff was made before she told anyone at the company that she was pregnant.  Before the

Court can address these arguments, we must first address a threshold issue of when Plaintiff was

terminated.

### 1.    Plaintiff's Termination

First, the Court must determine when Defendant decided to terminate Plaintiff's

employment because only then can the Court determine who the relevant decisionmakers were

and what they knew for purposes of the *McDonnell Douglas* framework.  Defendant argues that

it decided to terminate Plaintiff's employment in December 2022 because that was when her

position was slated for elimination, and she first appeared on an Impact List.  Plaintiff opposes

---

*also Joseph v. Cont'l Airlines, Inc.*, 126 F. Supp. 2d 373, 376 n.3 (E.D. Pa. 2000) (analysis of a claim under Title VII applies in equal force to the PFPO)  Thus, Prior's claims under the PHRA and the PFPO fail for the same reasons her claim under Title VII fails as explained in detail below.

this interpretation and argues that when the facts are viewed in the light most favorable to her, they show that her termination was the result of a two-step process.  First, her position was slated for elimination; second, the company found her unqualified to fill open positions in other departments.  Plaintiff reasons that her termination was not final until *after* the second step.  For purposes of this motion, the Court agrees with Prior.  Granting all inferences in favor of Plaintiff, the Court concludes that IntegriChain employed a two-step process in terminating Prior:  (1) it first decided to eliminate her position; and (2) it then decided to terminate her employment.  (*See* Doc. No. 27-5 at 63:11–64:12 (Kozhushchenko testifying that "the decision to eliminate [a] position" is "different" from the "decision to terminate").)

Having determined that IntegriChain used a two-step process, the Court considers whether Plaintiff has put forth evidence of pregnancy discrimination under the *McDonnell Douglas* framework.  For the reasons explained below, the Court concludes that summary judgment for Defendant on Plaintiff's discrimination claims is appropriate because Plaintiff cannot show that the relevant decisionmakers for the elimination of her position—Burget, "in consultation with Jay Kinzer," (Doc. No. 25 ¶ 133)—knew she was pregnant in December 2022 when they decided to eliminate her position on the Patient team.  Neither can she show that the relevant decisionmakers who rejected Plaintiff for open positions on the C&P team—Brier and Chandawarkar—knew she was pregnant when they rejected her.  And even if she could make out a prima facie case as to the second step of her termination, the Court concludes that Defendant established a legitimate non-discriminatory business reason for not placing Plaintiff on the C&P team—she was unqualified for the roles and IntegriChain was cutting costs.  Plaintiff cannot establish that this proffered legitimate business reason was pretextual.

### a.    Prima Facie Case

To establish a prima facie case of pregnancy discrimination, a plaintiff must show that: "(1) she is or was pregnant and that her employer knew she was pregnant; (2) she was qualified for her job; . . . (3) she suffered an adverse employment decision;" and (4) "there is some nexus between her pregnancy and her employment termination that would permit a fact-finder to infer unlawful discrimination." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008). Here, only the first and fourth elements are at issue.

### i.    Knowledge of Pregnancy Element

*Step 1: Elimination of Plaintiff's Position.* It is undisputed that IntegriChain decided to eliminate Prior's position, "Product Manager-Patient" "sometime in December[] 2022." (Doc. No. 26.) It is undisputed that all nine employees who previously worked on the Patient team are no longer working on the Patient team. (*Id.*) It is further undisputed that IntegriChain was entirely unaware of Prior's pregnancy until she disclosed her pregnancy to Kinzer on January 12, 2023. (Doc. No. 25-39.) Therefore, the decision to eliminate Prior's position as well as the other eight positions on the Patient team had nothing to do with Prior's pregnancy.[10] The Court concludes that Prior cannot establish a prima facie case in connection with the elimination of her role at step one.

*Step 2: Termination.* Next, the Court considers whether IntegriChain was aware of Prior's pregnancy when it decided to terminate her. It is undisputed that as of January 9, 2023, three days before Prior's disclosure of her pregnancy, Burget and Kinzer determined that it

---

[10] The parties spill much ink over whether Prior's position was eliminated in connection with a reduction-in-force plan. (Doc. No. 23-1 at 17-18; Doc. No. 26 at 10; Doc. No. 30 at 10 n.8.) But whether her role was eliminated under a RIF plan or otherwise is of no moment because IntegriChain was unaware of her pregnancy when it rendered its decision at step one.

would be "problematic if [Prior] left [on] Thursday[, January 12, 2023]" as noted in the Impact Sheets, which pushed her "to a 1/24 date." (Doc. No. 25-38.) And while the company delayed her proposed termination date, it is also undisputed that the company was actively exploring alternative roles for her, as it did for the other eight persons on the Patient team, to obviate the need for her termination. (*Id.*) Burget met with Brier, for example, to suggest that Brier take Prior on his division of the C&P team. (*Id.*) Burget also suggested, as late as January 20, 2023, that Chandawarkar employ Prior in his division of the C&P team. (Doc. No. 27-4 at 29:16–30:6.) Ultimately, IntegriChain terminated Prior on January 31, 2023. (Doc. No. 28 ¶ 178.) While Burget and Kinzer were aware of Prior's pregnancy on or about January 12, 2023, the record shows that Brier and Chandawarkar, the two final decisionmakers who determined that Prior was unqualified for a product manager position on the C&P team, were not. There is no evidence that either Brier or Chandwarkar were aware of her pregnancy when rendering their decisions.

Although Prior intimates that Burget may have discouraged Brier from hiring her by controlling what information Brier considered in deciding whether she was qualified, the record belies this speculation. First, Brier affirmatively testified that he had no knowledge that Prior was pregnant when he rendered his decision not to hire her for his team. (Doc. No. 27-4 at 23:20–24:5.) Second, Brier did not simply or exclusively rely on Burget and Kinzer to decide whether Prior was qualified but, instead, considered his own personal interactions with Prior as well as his knowledge of Prior's experience on the Patient team. (Doc. No. 27-4 at 21:14–17.) And finally, it is undisputed that Prior, unlike the person hired to fill the product manager position on Brier's team, had no experience in government pricing. (Doc. No. 28 ¶ 163.)

Prior also objects that "Defendant has not produced any documents reflecting any deliberative process in which it was concluded (by anyone) that Ms. Prior was not fit for . . . [any] open product manager positions within the company's Contract & Pricing area." (Doc. No. 26 at 4.) The absence of any written documentation, Prior suggests, supports an inference that Prior was not seriously considered for any role on the C&P team. This inference not only runs counter to the evidence, which includes Brier's testimony as to his deliberative process, but also is unsupported by the record. There is no evidence of record to show that Brier or Chandawarkar produced written documentation in connection with other candidates for the role but not for Prior. That is, there is no evidence that Prior was treated less favorably than other candidates for the product manager role on the C&P team let alone that she was treated less favorably because of her pregnancy.

In short, the Court concludes that Prior also cannot establish a prima facie case in connection with her termination at step two because the decisionmakers, Brier and Chandawarkar, were unaware of her pregnancy.

### ii. Nexus Element

Even if Brier and Chandawarkar were aware of her pregnancy, however, there remains some doubt over whether she can establish a nexus between her termination and her pregnancy. As IntegriChain notes, it is "not enough" for Plaintiff to show "that Defendant was aware of her pregnancy." (Doc. No. 30 at 5.) She must also demonstrate a nexus between Prior's pregnancy and her termination.

The Third Circuit has recognized that to prove a "causal link" or nexus "a plaintiff may rely upon a broad array of evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283-84 (3d Cir. 2000). Still, "[t]he evidence most often used to establish this nexus is that of disparate

treatment, whereby a plaintiff shows that she was treated less favorably than similarly situated

employees who are not in plaintiff's protected class. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527

F.3d 358, 366 (3d Cir. 2008). That is, usually a plaintiff will identify an appropriate comparator.

"A comparator . . . need not be identical but must be similarly situated in 'all material

respects.'" *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024) (citing *In re Tribune Media Co.*,

902 F.3d 384, 403 (3d Cir. 2018)). "Factors that are relevant [in identifying an appropriate

comparator] include whether the employees dealt with the same supervisor, were subject to the

same standards, and shared similar job responsibilities." *Id.* "An employee who holds a

different job title or works in a different department is not similarly situated." *Id.* (citing *Mandel

v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013)).

Beyond identifying similarly situated employees, or comparators, who are treated more

favorably than the plaintiff to support an inference of a nexus, the temporal proximity between

disclosure of a plaintiff's pregnancy and an adverse act may also support an inference. *LeBoon

v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). And "w[h]ere the

temporal proximity between the protected activity and the adverse action is 'unusually

suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary

judgment." *Id.*

"[T]here is no bright line rule as to what constitutes unduly suggestive temporal

proximity." *Id.* But generally, courts have concluded that a gap of nineteen months is not unduly

suggestive, *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997), nor is a gap of five

months, *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007), nor a gap of three months, *LeBoon*,

503 F.3d at 233 (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)). By

contrast, a two-day gap is unduly suggestive. *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.

1989); *but see Farrell*, 206 F.3d at 280 (declining to decide whether a gap of "three to four weeks" is unduly suggestive).

**No Direct Evidence of Discrimination.**    First, it is undisputed that the record contains no direct evidence of discrimination.  Prior conceded that she never experienced discrimination in connection with her first or second pregnancies, and she has not identified evidence of direct discrimination in connection with the disclosure of her third pregnancy.  (Doc. No. 28 ¶¶ 11, 23, 47–48, 178, 190, 194.)  Indeed, in connection with her first two pregnancies, she testified that she requested and received all leave to which she was entitled under IntegriChain policy.  It is further notable that despite learning of her pregnancy on January 12, 2023, IntegriChain's course of action did not change.  Even after learning that she was pregnant, IntegriChain continued its search to place Prior in an alternate role through at least January 20, 2023 when Burget asked whether Chandwarkar was interested in hiring Prior, among others, from the Patient team whose roles were to be eliminated.  Had IntegriChain, instead, stopped searching for an alternate placement for Prior upon learning of her pregnancy, then such change in course would support an inference of discrimination.

**No Circumstantial Comparator Evidence.**    Given the absence of direct evidence of discrimination, Prior relies on circumstantial comparator evidence to establish the nexus between her termination and her pregnancy.  She urges that "her male co-workers on the Patient team were placed into new and/or existing positions within the company while Plaintiff was terminated."  (Doc. No. 26 at 10.)  This purportedly establishes that the non-pregnant "employees on her team were treated more favorably, by being retained and placed into other open positions."  (Doc. No. 26 at 10.)  But Prior does little to explain how any of the other eight employees on the Patient team are appropriate comparators.  Indeed, none of these other eight

employees are similarly situated in "all material respects." *Qin*, 100 F.4th at 474. Not one of the purported comparators had the same title or responsibilities as Prior. It is undisputed that seven of the eight employees who were reassigned rather than terminated were "engineers or data scientists." (Doc. No. 28 ¶ 112.) And it is undisputed that Prior is not an engineer or data scientist. (*Id.* ¶ 68.) It is further undisputed that the eighth Patient team employee who was retained rather than terminated was an India-based junior employee (*id.* ¶ 114), who was paid just fifteen percent of what Prior was paid as a Senior Manager (*id.* ¶ 92). So, this junior employee is also not an appropriate comparator because he did not have the same job title as Prior, did not have the same job responsibilities, was not based in the same office, and was not paid a similar amount of money. Moreover, they did not share the same supervisor as Prior reported to Kinzer while this junior employee reported to her. Other than noting that she was the only pregnant employee among the nine Patient employees whose positions were eliminated, Prior fails to explain how this supports an inference of discrimination.

Prior urges that the "fact pattern" here "is sufficient to establish the fourth prong of the prima facie case," under *Brennan v. Five Below, Inc.*, No. 22-1383, 2025 WL 817597 (E.D. Pa. March 13, 2025). (Doc. No. 26 at 20.) The undisputed record, however, belies Prior's argument and *Brennan* is entirely inapposite. In *Brennan*, an employee sued her employer after she was terminated two weeks before she was scheduled to take maternity leave. 2025 WL 817597 at *1. The employee sued alleging pregnancy discrimination and retaliation under Title VII, the PHRA, the PFPO, and the FMLA. *Id.* Her employer moved for summary judgment urging that the plaintiff failed to establish the nexus prong of her prima facie case. *Id.* The court disagreed. *Id.*

In denying summary judgment, the court concluded, contrary to the employer's contention, that four key pieces of evidence supported her prima facie case. First, the employee

was terminated two weeks before her leave was scheduled to begin—the court viewed this timing as "unusually suggestive" of discrimination. *Id.* at *4. Second, after the employee's termination, the employer filled her vacancy with a worker who had no experience in the role. *Id.* Third, the employer told the employee that her termination was based on "restructuring *not* her performance," *id.*, but later proffered that her termination was based on poor performance despite the employer never having placed her on a performance improvement plan, *id.* at *2. Fourth, and most notably, her supervisor admitted, under oath, "that the fact Plaintiff was pregnant and anticipating maternity leave 'might have' entered her mind when determining who to let go." *Id.* at *4. This evidence, the court rightly reasoned, supported the existence of a nexus between her termination and her pregnancy.

Here, the record does not contain any evidence that comes close to the evidence in *Brennan* to support a nexus finding. Prior's position was not backfilled with an inexperienced employee—rather the position was eliminated. IntegriChain has consistently maintained that her role was eliminated to cut costs and that Prior was not placed in an alternative position because she was not qualified, so there has been no change in the reasoning for Prior's termination as there was in *Brennan*. And crucially, unlike *Brennan*, there is no *smoking gun* testimony in this record to suggest that Prior's pregnancy "might have . . . entered into the mind" of any IntegriChain decisionmaker when determining whether to terminate Prior's employment. 2025 WL 817597, at *4 (internal quotation marks omitted). *Brennan* does little to advance Prior's cause.

***Unduly Suggestive Temporal Proximity.*** Although Prior has not established a nexus using either direct evidence or comparator evidence, the Court finds that she can establish a nexus by relying on the temporal proximity between her disclosure of her pregnancy and her

19

termination to support an inference of discrimination. Here, 19 days passed between Prior telling Integrichain about her third pregnancy and Integrichain formally terminating her employment. The Court finds that this gap of 19 days is unusually suggestive in view of the weight of persuasive authority from our sister courts. *See, e.g.*, *Laverty v. Drexel Univ.*, 2016 WL 245307, at *7 (E.D. Pa. Jan. 21, 2016) ("[A]n 18-day gap between announcement of pregnancy and termination could, as a general matter, give rise to an inference of discrimination."); *Rymas v. Princeton Healthcare Sys. Holding, Inc.*, 2017 WL 4858123, at *6 (D.N.J. Oct. 27, 2017) ("Here, Plaintiff was terminated fifty days after returning from maternity leave. The Court finds a reasonable jury could conclude there was sufficient temporal proximity between Plaintiff's leave and her termination, and that Plaintiff has stated a prima facie case of discrimination under the PDA."); *but see Morzine v. Phila. Hous. Auth.*, No. 18cv2174, 2021 WL 4592150, at *8 (E.D. Pa. Oct. 6, 2021) ("Morozin alleges ten days elapsed between the final complaint and his termination. This is not close enough to alleviate the need for a causal nexus.").

\*     \*     \*

The Court, thus, concludes that Prior can establish a nexus for purposes of her prima facie case because the timing of her termination was unusually suggestive of discrimination. However, Prior's inability to prove that any relevant decisionmaker knew that she was pregnant at the time the relevant decisions were made nevertheless dooms her prima facie case.

### b.    Legitimate Non-Discriminatory Reason for Termination

Even if Prior could establish a prima facie case of discrimination with respect to "step two" of her termination, that would not end the inquiry. Where a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for terminating her employment. *McDonnell Douglas*, 411 U.S. at 802.

This burden is "relatively light" and requires only that the employer "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* (emphasis in the original).

Here, IntegriChain has articulated a legitimate, non-discriminatory reason for terminating Prior's employment—she was unqualified for any alternate role on the C&P team and her termination was necessary to achieve cost reductions. As IntegriChain correctly notes (Doc. No. 30 at 11), Prior does not dispute that "Defendant has articulated a reason for Plaintiff's termination at this stage," but disputes only that the reason is pretext (Doc. No. 26 at 8 n.2). That she would concede IntegriChain established a purportedly legitimate, non-discriminatory reason for her termination is understandable given the consistency in the record that she was not qualified for the two alternative roles on the C&P team and her position was eliminated to reduce costs. (Doc. No. 28 ¶ 92.)

Because the Court concludes, and Prior concedes, IntegriChain has established a purported legitimate, non-discriminatory reason for terminating her employment, the Court turns to Prior's pretext argument.

### c.    Pretext

To establish pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. "If

the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Id.* Thus, in the mine run of cases, Prior is correct that a plaintiff "is not required to produce direct evidence of discriminatory intent to demonstrate pretext and survive a motion for summary judgment," because to reach the question of pretext, a plaintiff must usually have established the prima facie case. (Doc. No. 26 at 12 (citing *Burton v. Teleflex, Inc.*, 707 F.3d 417, 427 (3d Cir. 2013)).) Here, however, the Court has concluded that Prior cannot establish the prima facie case. Nevertheless, the Court concludes that even if she could establish a prima facie case as to step two of her termination, she cannot meet her burden of proving pretext.

On this record, Prior cannot show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the . . . proffered legitimate reasons for [IntegriChain's] action that a reasonable factfinder *could* rationally find them 'unworthy of creedence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes*, 32 F.3d at 764 (internal citations omitted). "[T]his standard places a difficult burden on the plaintiff" in acknowledgment of "an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Id.* (citing *Ezold v. Wolf, Block, Schorr, & Solis-Cohen*, 983 F.2d 509, 530–31 (3d Cir. 1992)).

To show pretext, Prior cites four areas of purported evidentiary inconsistency: (1) "conflicting averments . . . related to the timeline . . . around Plaintiff's termination" (Doc. No. 26 at 12); (2) "inconsistent information about the general circumstances around Plaintiff's termination—calling it a [reduction in force] in the present Motion in contrast to how it described the termination in prior sworn responses" (*id.*); (3) "inconsistent information

regarding who decided to terminate Ms. Prior" (*id.*); and (4) "inconsistent information about what and how many positions were open such that Plaintiff was considered for them" (*id.*).

IntegriChain persuasively addresses each of these purported inconsistencies in its reply brief. (Doc. No. 30 at 7–8.) And the Court agrees that these four purported inconsistencies do not establish pretext.

First, Prior urges that the timeline of IntegriChain's decision to terminate her employment is riddled with inconsistencies. But as the Court explained above, the timeline is relatively free of dispute. The parties agree that Prior's position was definitively slated for elimination in December 2022. (Doc. No. 26 at 3.) And while the parties disagree over whether IntegriChain had also decided to terminate Prior's employment in December 2022, IntegriChain's Chief of HR, Kozhushchenko, established that IntegriChain's termination decision followed a two-step procedure and the second step—the decision to terminate—was made after Prior disclosed her pregnancy.

Second, whether Prior was terminated in connection with a RIF to lower costs or terminated on an individual basis to reduce costs is immaterial. Whether she was terminated through a RIF or terminated for "Cost Savings/Budget Adjustment" and "project work elimination" as listed in the Impact Sheets, is immaterial as to the question of whether IntegriChain's proffered reason for terminating her—that she was unqualified for a role on the C&P team and needed to be terminated for cost savings purposes—is "unworthy of credence." *Fuentes*, 32 F.3d at 765.

Third, as IntegriChain explains, there is no inconsistency regarding who it identified as key decisionmakers. It has consistently identified "Burget as a decisionmaker 'in consultation

with Jay Kinzer" as responsible for eliminating her role, and Chandawarkar and Brier as those who determined that Prior was unqualified for a job on the C&P team.[11]  (Doc. No. 30 at 12.)

Fourth, while Prior also claims that IntegriChain has inconsistently represented that it had been considering her for either one or two open positions on the C&P team, the number of open positions is of no moment absent any facts to show that Prior was qualified for and denied those roles because of her pregnancy.[12]  Indeed, IntegriChain has otherwise consistently maintained that "it considered . . . Prior for other 'similarly situated product roles,' including two C&P roles."  Whether she was considered for one, two, or more roles is simply immaterial.  (Doc. No. 30 at 12 (citing Doc. No. 25-49 ¶ 22; Doc. No. 27-6 at 173:7–174:7).)

\*       \*       \*

At bottom, even if Prior could establish her prima facie case, she cannot otherwise carry her burden of proving pretext.  Accordingly, the Court grants Defendant's motion for summary judgment.

### B.    FMLA

That leaves Prior's claims for retaliation and interference under the FMLA.  For the following reasons, these claims fail as well.

---

[11] Although Kinzer testified that he was not the ultimate decision maker regarding Prior's termination, he otherwise testified that he was involved in the process as he was her direct supervisor.  (*See, e.g.*, Doc. No. 27-2 at 13:21–24; *id.* at 41:2–15; *id.* at 48:18–49:5 (discussing communication plans for terminating Prior's employment).)

[12] Prior urges the Court to consider that she could have been retrained for other positions, but it is not within the Court's purview to assess whether an employer's business decision "is wise, shrewd, prudent, or competent."  *Fuentes*, 32 F.3d at 765.  The Court is concerned only with whether her employer's decision was motivated by discriminatory animus.  *Id.*  Moreover, that Prior contends that she could have been retrained underscores that she was not—without an investment of company resources—qualified to join the C&P team as Chandawarkar and Brier concluded.

To state a claim for retaliation, a plaintiff must show that (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) there is a causal link between the protected activity and the adverse action. *Kenergerski v. Harper*, 6 F.4th 531, 536 (3d Cir. 2021). To demonstrate a causal connection, a plaintiff generally must show "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014).

To establish a claim for interference under the FMLA, a plaintiff must show:

(1)    he or she was an eligible employee under the FMLA;

(2)    the defendant was an employer subject to the FMLA's requirements;

(3)    the plaintiff was entitled to FMLA leave;

(4)    the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and

(5)    the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017).

IntegriChain argues, and the Court agrees, that Prior cannot establish either FMLA claim for at least two reasons. First, it is undisputed that, with respect to her third pregnancy, Prior did not affirmatively invoke her FMLA rights nor did she give notice to Defendant of her intent to do so. (*See, e.g.*, Doc. No. 25-1 at 96 (Q: "Prior to your separation, did you [Prior] at any point put in notice that you would require FMLA leave for your third pregnancy?" A: "No").) Prior suggests that IntegriChain was on notice of her future invocation of her rights by virtue of her disclosure of her pregnancy, but again the record belies her position. While Kozhushchenko, who was not the ultimate decisionmaker regarding Prior's termination, explained that "as a

human resources professional she assumes that when an employee is pregnant," (Doc. No. 29 ¶ 52), that employee is going to need "some type of leave," (Doc. No. 27-5 at 118:21–119:7), this evidence alone does not permit an inference that IntegriChain was on notice.  As IntegriChain notes in its reply brief, Kozhushenko's testimony established only that "she 'assumed' *a* pregnant employee would go on leave, not that she [and IntegriChain] 'understood' *Ms. Prior* would." (Doc. 30 at 14) (emphasis in the original).  Moreover, that Kozhushenko assumed a pregnant employee would seek "some type of leave," does not support the inference that the "type of leave" invoked would be unpaid FMLA leave as opposed to any paid leave that would be available as a matter of company policy.  (*See, e.g.*, Doc. No. 25-1 at 122–23 (Prior testifying to the combination of various forms of paid, unpaid, and short-term disability leave that she used in connection with her first and second pregnancies).)

Second, as explained in detail above, Prior cannot show that IntegriChain's reason for terminating her was pretextual.  That is, she cannot show that IntegriChain terminated her to interfere with her invocation of her FMLA rights or to retaliate against her for doing so.

Accordingly, summary judgment is also appropriate as to Prior's FMLA claims.

## IV.  CONCLUSION

For these reasons, the Court grants Defendant's motion for summary judgment.  An appropriate Order follows.